726 F.Supp. 747 (1989)
ASSOCIATION OF COMMUNITY ORGANIZATIONS FOR REFORM NOW a/k/a ACORN, and John Hickey, Plaintiffs,
v.
ST. LOUIS COUNTY, Gilbert H. Kleinknect, and Peter McMahon, Defendants.
No. 86-1733 C(5).
United States District Court, E.D. Missouri.
October 31, 1989.
*748 Michael J. Hoare, John D. Lynn, St. Louis, Mo., for plaintiffs.
Thomas Wehrle, County Counselor, Andrew J. Minardi, Assoc. Co. Counselor, Michael Shuman, Asst. Co. Counselor, Clayton, Mo., for defendants.

MEMORANDUM
LIMBAUGH, District Judge.
Plaintiffs bring this action under 42 U.S.C. § 1983 for declaratory and injunctive relief alleging that § 1209.090 of St. Louis County's Traffic Codebarring solicitors from entering the roadway to ask for contributions from motoristsunduly intrudes upon their right to freedom of speech as guaranteed by the first and fourteenth amendments to the United States constitution.
This suit was tried before the Court sitting without a jury. This Court, having considered the pleadings, the testimony of the witnesses, the documents in evidence and the stipulation of the parties, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law, as required by Federal Rule of Civil Procedure 52.

I. Findings of Fact.

Plaintiff, Association of Community Organizations for Reform Now (ACORN), through its local St. Louis Chapter known as Missouri ACORN, is a non-profit advocacy organization lawfully operating in the State of Missouri. Plaintiff John Hickey is a member of ACORN, and is its head organizer *749 in St. Louis. Defendant St. Louis County is a political subdivision of the State of Missouri existing under the laws of the state and authorized by state law to promulgate and enforce the ordinance challenged herein. The other defendants are the Superintendent of Police of St. Louis County and the Director of the Department of Revenue for St. Louis County.
ACORN's purpose, as stated in its corporate charter, is to "advance the interests of low and moderate income people as citizens of the United States and their respective communities and states, in every area of their interest and concern." ACORN seeks to implement its goals of social and economic change by organizing low and moderate income citizens into grassroot neighborhood organizations. They further attempt to implement these goals by engaging in various kinds of informative and persuasive speech designed to mobilize sizeable numbers of people to influence private and public decisionmakers with respect to issues of common concern to its membership. These issues are as broad as the problems of low and moderate income people, typically focusing on housing, jobs, city services and community development, political representation, voter registration, health care, crime, energy and utilities.
ACORN's "toll road" program in St. Louis is part of the group's effort to disseminate its views to the public, raise its name recognition and gather funds to support its causes. ACORN's toll roads take place at signalized intersections throughout the metropolitan area but are predominant in St. Louis County. Solicitors for ACORN station themselves on a median, sidewalk or shoulder of the road, and wait until the light is red. They step into the roadway when the light turns red. Carrying a cannister, the solicitors approach the occupants of motor vehicles detained at the intersection, identify ACORN, briefly mention one of the organization's goals, ask for a $1 contribution, and offer a slip of paper which provides further information about ACORN. They then move to the next car in line. Frequently, one solicitor yells to the others when the cross-traffic light turns to amber indicating that their light will soon turn green so that the solicitors can retreat to a position of safety. Sometimes solicitors can tell on their own when the light turns green simply by driver behavior. Either way, when the light turns green, the solicitors retreat to the shoulder or median until the next red light.
Transactions with motorists at a toll road are abbreviated, averaging approximately five seconds, sometimes ten seconds when a donation is made. ACORN instructs its solicitors to keep the transaction short so that they can reach a greater number of cars and avoid tying up traffic. Solicitors do not make change because it is not practical within the limited amount of time. They do not converse with motorists such as giving them directions, or answering questions about the purposes of ACORN. Instead, they direct any questions to the phone number found on the slip of paper they give the motorist.
The St. Louis County Council on November 22, 1985 enacted a new "traffic code" which became effective on January 1, 1986. Section 1209.090 of the Revised Traffic Code provides as follows:
1209.090 Pedestrians Soliciting Rides or Business.
1. No person shall stand in a roadway for the purpose of soliciting a ride, employment, charitable contribution or business from the occupant of any vehicle.
Section 1209.090 of the Traffic Code does not forbid solicitors from seeking and collecting funds from the occupants of motor vehicles if they remain at all times on the median of a divided highway or along the shoulder of the road beyond the curbline or edge of the pavement. Section 1209.090 does, however, prohibit ACORN solicitors from entering the roadway (i.e. that portion of the pavement used for vehicular travel typically delineated by edge lines or curbs) of all streets and roads in the unincorporated part of St. Louis County, all county arterial roads within municipalities, and all state and federal highways in the unincorporated area of St. Louis County if their purpose is to elicit or collect money contributions from the occupants of motor vehicles. *750 Persons not complying with Section 1209.090 are subject to criminal penalties.
Prior to the effective date of the new traffic code, St. Louis County issued "toll road" permits to various groups and organizations, including ACORN, who wished to conduct on-street solicitation of donations from motorists and their passengers. The County, however, discontinued issuing such permits after the effective date of the new code because Section 1209.090 prohibited it. At least seven municipalities in the County, relying upon this Section, have forbidden ACORN from soliciting on arterial roads there.
ACORN contends it cannot conduct a meaningful toll road if its solicitors are restricted to off-street stations because it is usually necessary for a solicitor to step into the roadway and walk directly up to the car window in order to win the driver's attention and communicate effectively with him. Furthermore, cars do not always pull up close enough to the median or shoulder to allow a solicitor to collect a donation without stepping into the roadway.
Paul C. Box, a traffic engineer of 40 years, testified as an expert witness on behalf of ACORN. Much of Mr. Box's work over the years has focused on accident and safety analysis. In his 40 years of experience, Mr. Box could not recall seeing a single accident report that involved a solicitor. Most of these reports occurred in the Chicago area; however, Mr. Box reviewed very few accident reports occurring in St. Louis County.
David Clohessy was plaintiffs' other witness. He was a former employee of ACORN for an eight-year period. He solicited over 100,000 cars a year, and testified that he knew of no accidents or injuries caused by the soliciting activity. Mr. Clohessy further stated, however, that his knowledge of the lack of injuries extended to the plaintiffs' solicitors only. Plaintiffs' solicitors are well trained, and are probably less likely to escape injury than casual solicitors who are not trained, such as student groups who rarely solicit.
One example of a casual solicitor suffering injury was defendants' witness Anna Lee Jackson. Ms. Jackson solicited funds once a year for three years on "Old Newsboys Day." On November 19, 1987 she was at the intersection of Martin Luther King and Newstead. When the cars came to a stop at the intersection she entered the roadway to sell newspapers. When the light turned green she was still in the roadway. In order to return to a position of safety she had to cross two lanes of traffic. She walked between two cars to get through the first lane. As she entered the second lane, however, she was struck by a van. She suffered a broken leg, several fractures to her pelvis, a concussion, a herniated disk in her lower back, and possibly a hole in her eardrum resulting from the impact.
Neal Kurlander, the Chief of Police of the municipality of Maryland Heights in the County, was a former city police officer who received training in traffic laws. He testified for the defendants that experiences have proven that any pedestrian, whether in the street or highway for whatever reason, faces a hazard with respect to safety because of traffic. He has seen numerous groups of solicitors in action who had toll permits. They tended to slow traffic, and moved between cars from lane to lane in their solicitation.
Joe Passanise is the county's traffic planning supervisor. He has worked 21 years for the St. Louis County Department of Highways and Traffic. His experiences have also confirmed that pedestrians face hazards if they are in the streets and are not protected. Mr. Passanise reviewed statistical information from the Missouri Department of Highway Safety, and general statistical information from the federal government regarding pedestrian activity. From those statistics, Mr. Passanise opined that pedestrians are a hazard even under normal circumstances, (such as crossing the street at a cross-walk), let alone when they are on the road for abnormal activity, such as solicitation. However, in his examination of the statistics, he did not find any evidence of accidents involving solicitors.
The deposition of Robert Reeder was entered into evidence on behalf of defendants. *751 Mr. Reeder has been employed at the Traffic Institute of Northwestern University since 1960. It is an educational institution with a focus upon highway safety, and is widely recognized as a leading institution in the country in the area of traffic safety. When asked what the dangers associated with toll roads are, Mr. Reeder testified:
We are talking about death, serious personal injury. If you look at accident statistics, you will find that in urban areas the pedestrians suffer, and that is the real public safety issue in traffic in urban areas is pedestrians in the street, crossing the street, walking in the street, running into the street, walking, standing. The statistics indicate this is a very dangerous place for pedestrians to be.
Deposition of Robert Reeder, p. 14. Mr. Reeder testified that the dangers involved with toll roads are numerous. These include dangers at times when cars fail to stop at lights which result in rearend collisions. It also includes the presence of drunk drivers on the road.
Finally, the Court reviewed a videotape introduced into evidence. The videotape, taken on May 28, 1988, shows solicitation by individuals at the intersection of Olive Boulevard, McKnight Road and Woodson Road. Without doubt, the tape demonstrates that there is a significant safety concern linked with solicitation. It showed solicitors darting in between and around the cars, front and back, and from lane to lane. Occasionally, some of the individuals even remained in the street soliciting after the light had turned green.

II. Conclusions of Law.

ACORN seeks declaratory and injunctive relief alleging that Section 1209.090 unduly intrudes upon their right to freedom of speech as guaranteed by the first and fourteenth amendments. Thus, jurisdiction is invoked pursuant to Title 28 U.S.C. § 1343.
On one side of the equation is the fact that ACORN's toll road solicitation is an activity that is clearly protected by the first amendment. Village Schaumburg v. Citizens for a Better Environment, 444 U.S. 620, 633, 100 S.Ct. 826, 834, 63 L.Ed.2d 73 (1980). There is no doubt the ordinance in question clearly affects ACORN's first amendment rights. The opposing force in the equation, however, is that St. Louis County unquestionably has the power to regulate the activities of solicitors if the regulation is in furtherance of a legitimate governmental interest. Hynes v. Mayor and Council of Borough of Oradell, 425 U.S. 610, 616-17, 96 S.Ct. 1755, 1758-59, 48 L.Ed.2d 243 (1976). Once the legislature has structured a regulation that affects a solicitor's first amendment rights, it is the duty of the court to balance the equation and determine the regulation's constitutional validity. Thomas v. Collins, 323 U.S. 516, 530-32, 65 S.Ct. 315, 322-24, 89 L.Ed. 430 (1945).
To ascertain what limits, if any, may be placed on protected speech, the analysis must begin with the speaker's choice of forum. The standards by which limitations on speech must be evaluated vary depending on the choice of forum. Frisby v. Schultz, 487 U.S. 474, 108 S.Ct. 2495, 2499, 101 L.Ed.2d 420 (1988). Three types of fora exist in first amendment analysis: traditional public, the public created by governmental designation, and the non-public forum. Frisby, 108 S.Ct. at 2499.
Public streets are traditional public fora. "Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public." Hague v. Committee for Industrial Organization, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939). See Frisby, 108 S.Ct. at 2500. Courts must judge restrictions on speech in the public forum against stringent standards. Frisby, 108 S.Ct. at 2500. See also Perry Education Ass'n. v. Perry Local Educators' Assn., 460 U.S. 37, 44, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983). This does not mean, however, that simply because an activity is entitled to first amendment protection, it can be conducted unfettered of government regulation.
*752 There is no doubt that the roadways of St. Louis County are traditional public fora. In the traditional public forum it is unconstitutional for a government to prohibit all communicative activity. A restriction is constitutional, however, if the restriction on time, place and manner of expression is reasonable. There is a three-part test to determine if the speech restriction is reasonable. First, it must be content neutral. Second, it must be narrowly tailored to serve a significant governmental interest. Last, it must leave open ample alternative channels of communication. Frisby, 108 S.Ct. at 2500; City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984); Perry, 460 U.S. at 45, 103 S.Ct. at 954.
The first scrutiny is whether the restriction is content neutral or content based. The principal inquiry in determining content neutrality in time, place or manner cases is whether the government has adopted the regulation of speech because of a disagreement with the message the speech conveys. Clark v. Community for Creative Non Violence, 468 U.S. 288, 295, 104 S.Ct. 3065, 3070, 82 L.Ed.2d 221 (1984). The government's purpose is an important consideration. A regulation that serves purposes unrelated to the content of expression is deemed neutral. Renton v. Playtime Theatres, Inc., 475 U.S. 41, 47-48, 106 S.Ct. 925, 928-29, 89 L.Ed.2d 29 (1986).
The County's ordinance is content neutral, and neither party disputes that issue. The plain language of the statute shows that it is content neutral and it is neutral in its application. The County's principal justification for the restriction is to promote the safety of both solicitors and motorists, and to reduce traffic congestion. This justification for the regulation has nothing to do with content. Thus, it satisfies the requirement that time, place or manner restrictions be content neutral. Renton, 475 U.S. at 47-48, 106 S.Ct. at 928-29; Clark, 468 U.S. at 295, 104 S.Ct. at 3070.
Once the Court determines the restriction is content neutral, the Court must then turn to the issue of whether the regulation is narrowly tailored to serve a governmental interest. The validity of a regulation that infringes upon the exercise of first amendment freedoms can be sustained only if the regulation is narrowly drawn to further a legitimate governmental objective unrelated to the restriction of communication, and if it does not unduly intrude upon the exercise of first amendment rights. Heffron v. International Society for Krishna Consciousness, Inc., 452 U.S. 640, 649-50, 101 S.Ct. 2559, 2564-65, 69 L.Ed.2d 298 (1981); Virginia Pharmacy Board v. Virginia Citizens Consumer Council, 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976).
In applying the test to this case, it is clear that promoting the safety of motorists and solicitors is a legitimate governmental interest for the County of St. Louis to pursue. A municipality certainly has the power to regulate activities within its borders to increase the safety of its citizens. ACORN v. Frontenac, 714 F.2d 813, 818 (8th Cir.1983).
The Court's next inquiry after concluding the County's asserted objectives are legitimate, is to determine whether the regulation is sufficiently tailored so as to avoid conflict with plaintiff's first amendment rights. The Eighth Circuit has defined a regulation of speech to be narrowly tailored if the regulation is the least restrictive method of achieving the governmental goal. ACORN v. Frontenac, 714 F.2d 813 (8th Cir.1983). A governmental agency may not, in the interest of achieving its legitimate objectives, broadly prohibit plaintiff's activities when less restrictive alternatives will satisfactorily accomplish the same objectives. ACORN v. Frontenac, 714 F.2d at 819.
The Supreme Court, however, in its recent decision Ward v. Rock Against Racism, ___ U.S. ___, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989), has held that this test is too stringent. In Ward, the Second Circuit Court of Appeals concluded that the restriction imposed on free speech was not *753 narrowly-tailored to further the government's legitimate objective because "it has not been shown ... that the requirement of the use of the city's sound system and technician was the least intrusive means of regulating volume." Ward v. Rock Against Racism, 848 F.2d 367, 370 (2d Cir.1988). The Second Circuit believed several less restrictive alternatives existed to accomplish the same objective.
In response to the Second Circuit's analysis, the Supreme Court stated:
The Court of Appeals erred in sifting through all the available or imagined alternative means of regulating sound volume in order to determine whether the city's solution was "the least intrusive means" of achieving the desired end. This "less-restrictive-alternative-analysis ... has never been a part of the inquiry into the validity of a time, place, and manner regulation." Regan v. Time, Inc., 468 U.S. 641, 657, 104 S.Ct. 3262, 3271, 82 L.Ed.2d 487 (1984).
Ward, 109 S.Ct. at 2757. The Supreme Court continued to opine that:
[l]est any confusion on the point remain, we affirm today that a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate content-neutral interests but that it need not be the least-restrictive or least-intrusive means of doing so. Rather, the requirement of narrow tailoring is satisfied "so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." United States v. Albertini, 472 U.S. 675, 689, 105 S.Ct. 2897, 2906, 86 L.Ed.2d 536 (1985).
Ward, 109 S.Ct. at 2757-58.
Under this standard a government cannot burden substantially more speech than is necessary to further its legitimate objective. Nor can it impose a restriction in such a manner that a substantial portion of the burden on speech does not serve to advance its goals. Ward, 109 S.Ct. at 2758. "So long as the means chosen are not substantially broader than necessary to achieve the government's interest, however, the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." Ward, 109 S.Ct. at 2758 (Court's emphasis).
With this holding in mind, it is apparent that the County's regulation is sufficiently tailored to promote the government's legal objective. First, there can be no doubt from the evidence, as well as one's own common sense, that soliciting in the streets is inherently dangerous. Plaintiff's own witness, David Clohessy, testified that although he believed ACORN solicitors were well trained, casual solicitors who are not trained are less likely to escape injury. Defendant's witness Anna Jackson is the prime example of this. She was an untrained solicitor who was badly injured by a vehicle at an intersection. The Chief of Police, the County's Traffic Planning Supervisor and Robert Reeder have all testified that based on their experiences, in their respective careers, they have developed firm convictions that it is simply too dangerous to allow solicitors on the roadways. Furthermore, ACORN itself recognizes how dangerous soliciting is or it never would devote such an enormous amount of energy to training its workers in safety. Finally, on the videotape, the Court was able to see first hand the danger of soliciting. Thus, it is clear that the regulation prohibiting solicitors from soliciting funds in the streets, but allowing them to solicit funds from the median or shoulders of those same streets, promotes a substantial governmental interest that would be achieved less effectively without the prohibition. Ward, 109 S.Ct. at 2758.
ACORN solicitors are still permitted to solicit funds from cars. They are able to walk down the median and solicit funds from the drivers in the lane closest to the median, and proceed from the car stopped first in line and work towards the back of the line, just as they would do if permitted into the street. Plaintiffs contend, however, that they will not be able to win the driver's attention and communicate with the driver as effectively as they could without the regulation. That plaintiff cannot *754 attract the attention of the driver as forcefully when restricted to the median, however, does not amount to substantially greater restrictions on speech than necessary to further the government's interest in safety. Ward, 109 S.Ct. at 2758.
The testimony of plaintiffs' expert Paul C. Box was impressive. Mr. Box testified about methods of restricting toll-roads that may be less-speech-restrictive alternatives to the County's regulation. According to Ward, however, it can no longer be argued that the existence of a less restrictive alternative invalidates the County's regulation.
Section 1209.090 is not substantially broader than necessary to achieve the government's interest in promoting safety. Thus, the regulation meets the second part of the test that it must be narrowly tailored to serve a significant governmental interest. Ward, 109 S.Ct. at 2757-58; Frisby, 108 S.Ct. at 2500.
The final prong of the test is whether the restriction leaves open ample alternative channels of communication. Frisby, 108 S.Ct. at 2500. So long as the amount of the speech left open is ample, it is not fatal that the regulation diminishes the total quantity of speech. City of Watseka v. Illinois Public Action Council, 796 F.2d 1547, 1553 (7th Cir.1986); aff'd. 479 U.S. 1048, 107 S.Ct. 919, 93 L.Ed.2d 972 (1987). Both parties clearly agree that the County's regulation leaves open ample alternative channels of communication. The Court also finds that the County's regulation meets this prong of the test.
In conclusion, based upon the current state of the law in first amendment analysis, Section 1209.090 of St. Louis County's Traffic Code does not unduly intrude upon ACORN's right to freedom of speech as guaranteed by the first and fourteenth amendments. The Court finds in favor of defendants and against plaintiffs in this cause of action and judgment shall be entered accordingly.