## ASSOCIATION OF COMMUNITY ORGANIZATIONS FOR REFORM NOW a/k/a ACORN, and David Clohessy, Appellants,

v.

## ST. LOUIS COUNTY; Gilbert H. Kleinknecht, Superintendent of Police, St. Louis County; and Lester A. Liebmann, Director of Department of Revenue, St. Louis County, Appellees.

### No. 89–3011.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 14, 1990.

Decided April 8, 1991.

John D. Lynn, St. Louis, Mo., for appellants.

Michael E. Shuman of Clayton, Mo., for appellees.

Before JOHN R. GIBSON, Circuit Judge, HENLEY, Senior Circuit Judge, and CONMY,* District Judge.

* The Honorable Patrick A. Conmy, Chief United States District Judge for the District of North Dakota, sitting by designation.

JOHN R. GIBSON, Circuit Judge.

This case presents a first amendment challenge to a traffic code provision prohibiting solicitation in the roadways of St. Louis County, brought by ACORN, a non-profit advocacy organization, and one of its members, against St. Louis County, Missouri, its Superintendent of Police and its Director of Revenue. After a bench trial, the district court[1] held that the challenged regulation is a permissible time, place and manner restriction serving the government's interest in safety and traffic efficiency and entered judgment for St. Louis County. *Association of Community Organization for Reform Now v. St. Louis County*, 726 F.Supp. 747 (E.D.Mo.1989). ACORN appeals, arguing that its method of in-the-roadway solicitation is safe, and that St. Louis County could have achieved its desired result in a less restrictive manner. We affirm.

## I.

ACORN has in the past raised money in St. Louis County by soliciting donations from drivers at busy intersections in an operation it calls a "toll road". ACORN's practice is to post solicitors at intersections with traffic lights. They wait on medians or on the sidewalk or road shoulder until the light turns red. Then they walk into the street and approach the stopped vehicles carrying cans for collecting money and "tags," which are little slips of paper with information about ACORN. They start with the first car at the light, then work their way down the row, briefly telling each driver about one of ACORN's goals, asking him for a contribution and giving him a tag. Solicitors may be in each of several lanes of traffic at an intersection, including lanes that are not adjacent to a median or curb. Sometimes, ACORN stations someone at the intersection to shout at the solicitors when the light for the cross street turns yellow, and sometimes the solicitors depend on familiarity with the length of the red light or cues

from sounds and driver behavior. In any case, ACORN's *ideal* is that the solicitors leave the roadway when the light for the cross street turns yellow. ACORN had for a number of years obtained permits from St. Louis County for its solicitation activities.

St. Louis County Traffic Code § 1209.090, enacted on November 22, 1985, provides:

*Pedestrians Soliciting Rides or Business*—1. No person shall stand in a roadway for the purpose of soliciting a ride, employment, charitable contribution or business from the occupant of any vehicle.

The County thereafter advised ACORN that it will enforce section 1209.090 against ACORN solicitors who go out into the roadway to solicit contributions from drivers, and stopped issuing permits to ACORN. There was testimony at the trial that the County's purposes in enacting section 1209.090 were to promote pedestrian and motorist safety; and that the County's interest in traffic efficiency was also threatened by the "toll roads."

The evidence at trial consisted primarily of testimony about the dangers of in-the-roadway solicitation generally, in-the-roadway solicitation as practiced by ACORN, and ideal in-the-roadway solicitation. St. Louis County's experts all agreed that in-the-roadway solicitation generally is dangerous. ACORN's own expert testified that toll roads are dangerous unless regulated by an extensive set of rules. St. Louis County even produced testimony by a volunteer for another organization who had been hit by a car and seriously injured while collecting charitable contributions in the roadway. St. Louis County also introduced a videotape of an actual ACORN "toll road," in which according to ACORN's own expert, "ACORN people were violating practically every tenet that I have shown here in terms of safety," and delaying traffic after the light changed sixteen percent of the time. The district court

1. The Honorable Stephen N. Limbaugh, United States District Judge for the Eastern and Western Districts of Missouri.

found that "[w]ithout doubt, the tape demonstrates that there is a significant safety concern linked with solicitation. It showed solicitors darting in between and around the cars, front and back, and from lane to lane. Occasionally, some of the individuals even remained in the street soliciting after the light had turned green." At 751.

The only area of possible conflict in the testimony was whether in-the-roadway solicitation could ever be done safely and without impairing traffic efficiency. St. Louis County's experts testified that they knew of no technique that would make on-the-roadway solicitation safe. However, ACORN introduced the testimony of Mr. Paul Box, a traffic engineering consultant, who said that by the use of his eight point plan,[2] in-the-roadway solicitation could be done at "very little" risk to pedestrians, and with "no significant adverse affect [sic] on the flow of traffic."

St. Louis County's expert Robert Reeder specifically addressed the Box plan and stated that it would improve the safety of the solicitation, but that on-the-roadway solicitation would still not be a safe practice. St. Louis County's Traffic Planning Supervisor, Joseph Passanise, also stated that in-the-roadway solicitation subject to the eight restrictions still would not be safe.

The parties stipulated that section 1209.-090 does not forbid solicitors from soliciting drivers as long as they stand off the roadway—on the curb, median or shoulder of the road. Therefore, there is no ban on soliciting drivers—only on standing in the roadway to do it.

**II.**

The right to solicit contributions to a charitable or political cause is protected by the first amendment. *Schaumburg v. Citizens for Better Environment*, 444 U.S. 620, 633, 100 S.Ct. 826, 834, 63 L.Ed.2d 73 (1980). St. Louis County, as the party seeking to limit behavior protected by the first amendment, bears the burden of justifying its regulation. *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777, 106 S.Ct. 1558, 1564, 89 L.Ed.2d 783 (1986); *ACORN v. City of Phoenix*, 798 F.2d 1260, 1263 (9th Cir.1986). In a public forum, such as the streets, time, place and manner restrictions on the exercise of first amendment rights will be permitted if they "are justified without reference to the content of the regulated speech ... are narrowly tailored to serve a significant governmental interest, and ... they leave open ample alternative channels for communication of the information." *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984). In this case, the government interest in safety and traffic efficiency is "significant"; the restriction is clearly neutral as to the content of the regulated speech; and ACORN makes no argument that ample alternative avenues of communication do not exist. *See Frisby v. Schultz*, 487 U.S. 474, 482–85, 108 S.Ct. 2495, 2500–02, 101 L.Ed.2d 420 (1988).

The only issue that remained for consideration by the district court, and that this court must address, is whether the restriction is narrowly tailored to serve a significant governmental interest. This test governs the intrusiveness of governmental regulation in two ways. First, it governs

**2.** The eight point plan would:
1. Require solicitors to be 18 or older.
2. Require solicitors to wear high-visibility clothing, for example, orange vests.
3. Limit the number of solicitors per approach to the intersection to two or three individuals.
4. Require solicitors to leave the roadway and return to their stations in a neutral area (sidewalk or median) when the traffic signal changes to yellow for the cross traffic.
5. Restrict solicitation to the occupants of those vehicles detained by a red traffic light in (a) the left lane of one-way streets where

there is no curbed parking and (b) the lane adjacent to a median in two-way streets if the median is at least six feet wide.
6. Forbid solicitors from ever crossing in front of or in back of such vehicles. In other words, restrict solicitation to only one lane of traffic adjacent to the sidewalk or median and allow solicitors to approach only the driver's side of vehicles.
7. Require soliciting organizations to post a supervisor with a whistle at each intersection to monitor the traffic light and to ensure compliance with these safety rules.
8. Restrict solicitation to daylight hours.

the extent to which the regulation can have the incidental effect of burdening behavior that does not threaten the governmental interest in question.

A regulation must not "burden *substantially* more speech than is necessary to further the government's legitimate interests." *Ward v. Rock Against Racism*, 491 U.S. 781, 109 S.Ct. 2746, 2758, 105 L.Ed.2d 661 (1989) (emphasis added). On the other hand, the validity of the regulation is judged by its general effect, not whether enforcement in a particular case is necessary to protect the important governmental interest. *United States v. Albertini*, 472 U.S. 675, 688–89, 105 S.Ct. 2897, 2906, 86 L.Ed.2d 536 (1985). In *Ward*, New York City required groups performing in its park to use the city's sound system. One of the reasons for the requirement was that the city needed to make sure that the sound amplification was sufficient to reach all listeners within the defined concert ground. 109 S.Ct. at 2757. In upholding the city's requirement, the Supreme Court stated, "No doubt this concern [about inadequate sound] is not applicable to respondent's concerts, which apparently were characterized by more-than-adequate sound amplification. But that fact is beside the point, for the validity of the regulation depends on the relation it bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interests in an individual case." *Id.* at 2759. *Accord, Carew–Reid v. Metropolitan Transp. Auth.*, 903 F.2d 914, 918 (2d Cir.1990).

Second, the "narrowly tailored" requirement governs the degree of intrusion the government can impose on behavior that does threaten its interests to some degree. To justify any intrusion at all there must be a threshold showing that the factual situation demonstrates a real need for the government to act to protect its interest. In *United States v. Grace*, 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983), a ban on carrying signs on the sidewalks surrounding the Supreme Court building was held invalid because the government's interests in protecting persons and property on the grounds and protecting the Court's image as being free from political influence were not sufficiently threatened by the banned activity to warrant governmental action. *Id.* at 182–83, 103 S.Ct. at 1709–10. The danger the regulation protects against must be real, not speculative. *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1228 (9th Cir.1990). But, once over that threshold, the government's choice among the means to accomplish its end is entitled to deference.

In *Clark*, the National Park Service had adopted a ban on sleeping in Lafayette Park and the Mall in Washington, D.C., in order to conserve those parks. 468 U.S. at 296, 104 S.Ct. at 3070. An advocacy group planned a demonstration that would involve sleeping in those parks and challenged the ban on first amendment grounds. *Id.* at 291–92, 104 S.Ct. at 3067–68. The Supreme Court upheld the ban. Once the Court concluded that the Park Service regulation furthered the valid interest of park conservation, the law of the first amendment did not "assign to the judiciary the authority to replace the Park Service as the manager of the Nation's parks or endow the judiciary with the competence to judge how much protection of park lands is wise and how that level of conservation is to be attained." *Id.* at 299, 104 S.Ct. at 3072.

The Supreme Court recently summarized both aspects of the "narrowly tailored" requirement in *Ward*. "[A] regulation of the time, place or manner of protected speech ... need not be the least-restrictive *or* least-intrusive means of [serving the government's legitimate content-neutral interests]. Rather, the requirement of narrow tailoring is satisfied 'so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" 109 S.Ct. at 2757–58 (citations omitted) (emphasis added).

In applying the "narrowly tailored" requirement to the facts of this case, we must conduct an independent review of the "constitutional facts" at issue. *See Bose Corp. v. Consumers Union, Inc.*, 466 U.S.

485, 508–09 n. 27, 104 S.Ct. 1949, 1964 n. 27, 80 L.Ed.2d 502 (1984); *see also Doe v. City of Minneapolis*, 898 F.2d 612, 616 (8th Cir.1990).

■ ACORN first argues that its toll roads are not dangerous and that the scope of the regulation is therefore too broad. It argues that it has not had an accident occur during the conduct of a toll road in the five and one-half years experience of one of its witnesses. ACORN argues that its solicitors are specially trained for safety and the regulation is therefore an unnecessary burden on its first amendment rights. ACORN characterizes the evidence of the solicitor from another charity who was hit by a car as the "isolated exception that proves the general rule of safety."

The fact that there was no evidence of ACORN's solicitors being hurt is of no probative value. The government need not wait for accidents to justify safety regulations. *United States Labor Party v. Oremus*, 619 F.2d 683, 688 n. 4 (7th Cir.1980) (in upholding ban on in-the-roadway solicitation court states that the State need not wait for personal injuries).

Nor is it sufficient for ACORN to show that its particular practices are safe if the practice of in-the-roadway solicitation generally is dangerous. It is the regulation's relationship "to the overall problem the government seeks to correct," not its necessity in ACORN's particular case, that determines its validity. *See Ward*, 109 S.Ct. at 2759. Experts called by both parties in this case testified that soliciting in the roadway generally is dangerous and slows traffic. The district court found that "there can be no doubt from the evidence, as well as one's own common sense, that soliciting in the streets is inherently dangerous." At 753. Other circuit courts have upheld similar regulations based on the " 'evident dangers of physical injury and traffic disruption that are present when individuals stand in the center of busy streets trying to engage drivers and

solicit contributions from them.' " *United States Labor Party*, 619 F.2d at 688. *Accord, ACORN v. City of Phoenix*, 798 F.2d at 1268–70; *International Soc'y for Krishna Consciousness, Inc. v. City of Baton Rouge*, 876 F.2d 494, 498 (5th Cir. 1989) (solicitation ban also prohibited soliciting while standing on median or shoulder of road). Therefore, even accepting ACORN's argument that its solicitors were specially trained so as to remove their behavior from the realm of problems the government seeks to correct, the relationship between the regulation and the government's interest in safety and traffic efficiency is sound, and we hold that the regulation does not burden substantially more speech than is necessary to further the government's interests.

Furthermore, the evidence clearly showed that the ACORN solicitors' behavior did fall within the scope of the problems the government was trying to address. The videotape showed ACORN solicitors walking across lanes of traffic while cars were moving, detaining cars after the light turned green, and crossing between the front of one car and the rear of another. The solicitors regularly returned to the median only after the light turned green. ACORN's own expert testified that the tape showed ACORN's solicitors "violating practically every [safety] tenet" he had espoused. The district court found that the tape showed a "significant safety concern linked" with ACORN's practices, slip op. at 6, and that finding is supported abundantly by the record. There is no merit to ACORN's argument that the regulation is unwarranted in ACORN's case.

■ ACORN next argues that the regulation is unduly intrusive, because St. Louis County could accomplish the same goals less intrusively by adopting the Box eight-point plan.[3] St. Louis County easily passed the threshold test of proving that it acted in response to a real, not speculative, danger. After satisfying this threshold re-

---

**3.** As we read ACORN's argument, this is not simply another argument that the regulation applies to conduct that is not dangerous. Rather, ACORN argues that the County could make

solicitation safe by regulating it as Mr. Box proposes and prosecuting solicitors who violated such a regulation.

quirement, the county is not required to show that the regulation adopted was the least restrictive alternative. After *Ward,* the inquiry is whether St. Louis County "could reasonably have determined that its interests overall would be served less effectively without [section 1209.090] than with it." *Ward,* 109 S.Ct. at 2759. The regulation easily survives this test.[4]

The judgment of the district court is affirmed.

See also 462 N.W.2d 435.

---

**4.** Moreover, the record was at best contradictory as to whether even the Box eight-point plan would render in-the-roadway solicitation safe. The County's experts said it would not. *See supra* at 594. We note that two other circuit courts have upheld district court findings that in-the-roadway solicitation cannot be made safe. *International Soc'y for Krishna Consciousness, Inc.,* 876 F.2d at 498 (upholding district court finding that there is no way in-the-roadway solicitation can be made safe); *ACORN v. City of Phoenix,* 798 F.2d at 1270 (affirming decision in which district court found that even using the plan roughly equivalent to the Box proposal in this case, in-the-roadway solicitation was unsafe). We have no district court finding on this issue in this case, nor is one necessary, in light of our holding above.