The **DENVER PUBLISHING COMPANY** d/b/a **Rocky Mountain News, Plaintiffs–Appellees/Cross–Appellants,**

v.

The **CITY OF AURORA, Colorado; Paul E. Tauer, in his official capacity as Mayor of the City of Aurora, Colorado; and James Everett, in his official capacity as Chief of Police of the City of Aurora, Colorado, Defendants–Appellants/Cross–Appellees.**

No. 94SA36.

Supreme Court of Colorado, En Banc.

May 15, 1995.

Rehearing Denied June 5, 1995.

missibly burdened free speech, a city ordinance which proscribes direct solicitation from vehicles traveling city streets.[1] Having considered the relationship between the ordinance and the constitutional rights implicated, we conclude that the ordinance is narrowly tailored to advance a significant governmental interest. Accordingly, we reverse and remand the cause to the district court with directions to vacate the order enjoining enforcement of the ordinance.

Baker & Hostetler, James A. Clark, Todd L. Lundy, Marjorie N. Sloan, Timothy J. Goodwin, Denver, for plaintiffs-appellees.

Office of the Aurora City Atty., Charles H. Richardson, Julia A. Bannon, John E. Byron, Aurora, for defendants-appellants.

David W. Broadwell, Denver, for amicus curiae Colorado Mun. League.

Daniel E. Muse, City Atty., David E. Brase, Asst. City Atty., Denver, for amicus curiae City of Denver.

Chief Justice ROVIRA delivered the Opinion of the Court.

The question to be decided in this case is whether the district court erred in declaring unconstitutional, because it imper-

I

In 1993 the City of Aurora (City) adopted Ordinance 93–90 (Ordinance) to prohibit solicitation from occupants of vehicles traveling upon City streets or highways.[2] The Ordinance was enacted to address safety concerns raised by the activities of street vendors. The Denver Publishing Company, doing business as the Rocky Mountain News (News), objected to the Ordinance which adversely affected the News' direct sales program where vendors located at City street corners and medians solicited single copy newspaper sales from passing motorists (the "hawker" program). The News sued the City for declaratory and injunctive relief to enjoin enforcement of the Ordinance claiming it violated the First Amendment of the United States Constitution and article II, section

---

1. We exercise jurisdiction over this appeal pursuant to section 13–4–102(1)(b), 6A C.R.S. (1994 Supp.).

2. The Ordinance, codified at Aurora Municipal Code section 37–124, Solicitation on or Near Street or Highway, provides as follows:
   (a) The purpose of this section is to prevent dangers to persons and property, to prevent delays, and to avoid interference with the traffic flow. Roadways that have center medians often are designed to deal with specific traffic flow problems. Any delay or distraction may interfere with traffic planning. Sometimes persons stand near intersections and near traffic lights to contact drivers or passengers in cars that are passing or that are stopped temporarily due to traffic lights.
   (b) It shall be unlawful for any person to solicit employment, business, contributions, or sales of any kind, or collect monies for the same, from the occupant of any vehicle traveling upon any street or highway when such solicitation or collection:

(1) Causes the person performing the activity to enter onto the traveled portion of a street or highway.
(2) Involves the person performing the activity to be located upon any median area which separates traffic lanes for vehicular travel in opposite directions.
(3) The person performing the activity is located such that vehicles cannot move into a legal parking area to safely conduct the transaction.
(c) It shall be unlawful for any person to solicit or attempt to solicit employment, business, or contributions of any kind from the occupant of any vehicle on any highway included in the interstate system including any entrance to or exit from such highway.
(d) For purposes of this section, the traveled portion of the street or highway shall mean that portion of the road normally used by moving motor vehicle traffic.

10 of the Colorado Constitution.[3] After a trial, the court found the Ordinance unconstitutional, and issued an injunction prohibiting its enforcement.

The City appealed the following issues: (1) whether streets are traditional public fora while in use by motor vehicles; (2) whether the trial court erred in applying a strict scrutiny standard to a content-neutral ordinance; and (3) whether the Ordinance constituted a valid time, place and manner restriction under the First Amendment. On cross-appeal, the News raised the following questions: (1) whether the trial court erred in requiring the News to prove that the Ordinance was unconstitutional beyond a reasonable doubt; and (2) whether the trial court erred in according the Ordinance a presumption of constitutionality even though it curtailed freedom of speech. We first consider the City's issues on appeal and then turn to the News' questions on cross-appeal.

## II

### Forum

The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech...." U.S. Const. amend. I. Article II, section 10 of the Colorado Constitution provides that "[n]o law shall be passed impairing the freedom of speech; every person shall be free to speak, write or publish whatever he will on any subject...."

■ The Supreme Court has explained that the analysis of any governmentally imposed restriction of speech begins with an inquiry into the nature of the property affected by the regulation. *E.g., Hague v. Committee for Ind. Org.*, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939); *see also Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983) ("The existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the property at issue."). When the government owns the property to be regulated both constitutions nevertheless limit governmental restrictions on free speech. Particular care in regulation is required when the property in question is traditionally recognized as a forum associated with the dissemination of ideas. *Perry*, 460 U.S. at 45, 103 S.Ct. at 954–55; *see also Bock v. Westminster Mall Co.*, 819 P.2d 55 (Colo.1991).[4]

■ The public forum doctrine, first recognized in *Hague* is based upon the presumption that streets and parks have been "immemorially held in trust" for the purpose of assembly and the communication of ideas. *Hague*, 307 U.S. at 515, 59 S.Ct. at 963–64. Underlying *Hague* is the notion that places historically associated with First Amendment activities provide channels of communication to individuals who lack more sophisticated and expensive alternatives. Thus, while the privilege to use the public forum "may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and

---

**3.** The News originally brought the action under 42 U.S.C. § 1983 (1988) claiming that the Ordinance violated the News' right to free speech, free press, due process and equal protection under the United States Constitution; article II, §§ 3, 10 and 25 of the Colorado Constitution, and § 42–4–705(5) of the Colorado Revised Statutes. The News argued the Ordinance was unconstitutional both facially and as applied to it. The district court's order enjoining enforcement of the Ordinance was based on its conclusion that the ordinance unconstitutionally burdened free speech, and the issues on appeal all relate to free speech questions. We do not, therefore, address the News' free press, due process, equal protection or notice arguments.

**4.** In *Bock* we explained that Article II, Section 10 of the Colorado Constitution goes beyond the prohibition on governmental interference with speech contained in the First Amendment to include an affirmative declaration that Colorado citizens *"shall* be free to speak, write or publish...." *Bock*, 819 P.2d at 58 (quoting Colo. Const. art. II, sec. 10 (emphasis supplied)). *Bock* aptly articulated the principles underlying Colorado's "tradition of ensuring a broader liberty of speech," particularly when freedom to express political views is suppressed. *Id.* While no doubt exists that Colorado has high regard for freedom of speech, in *Bock*, we specifically acknowledged the right of the property owners "to impose reasonable time, place and manner restrictions on the conduct of petitioners' [speakers'] activity...." *Id.* at 63. Here, we merely take the analysis one step further to consider whether such a restriction, in this case imposed by the City, is indeed reasonable.

convenience, and in consonance with peace and good order; but it must not, in the guise of regulation be abridged or denied." *Hague*, 307 U.S. at 516, 59 S.Ct. at 964; *see also Perry*, 460 U.S. at 45, 103 S.Ct. at 954–55.

In *Perry*, the Court refined the public forum doctrine by delineating three categories of public fora: (1) traditional public fora that have a principal purpose devoted to the free exchange of ideas; (2) designated public fora where the government dictates the communicative uses of the property; and (3) remaining public property. *Perry*, 460 U.S. at 45–46, 103 S.Ct. at 954–56.[5]

■■■ Because our answer to the City's first question of whether City streets are public fora will necessarily influence the standard of review applied to the Ordinance we consider this issue first. The News claims that public streets are quintessential public fora, dedicated to the free flow of ideas. The City counters that we must consider modern streets and thoroughfares in light of their function, and if we focus on the nature of traffic, streets cannot be classified as public fora.[6] In *Frisby v. Schultz*, 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988), the Court answered a recurring question regarding the wisdom of considering modern streets traditional public fora. There, the Court explained that "[n]o particularized inquiry into the precise nature of a specific street is

necessary; all public streets are held in the public trust and are properly considered traditional public fora." *Frisby*, 487 U.S. at 481, 108 S.Ct. at 2500. Based on this precedent, we find that City streets are traditional public fora.

Our determination that City streets are public fora does not diminish the City's traffic concerns. Instead, the function and nature of modern streets elevates the government's interest in regulating the fora. That is, the dangers associated with car travel increase the government's interest in controlling the interaction between cars and pedestrians. *Cf. International Soc'y for Krishna Consciousness v. Lee*, —— U.S. ——, ——, 112 S.Ct. 2711, 2712, 120 L.Ed.2d 541 (1992) ("Consideration of the forum's special attributes is relevant to the constitutionality of a regulation since the significance of the governmental interest must be assessed in light of the characteristic and function of the particular forum involved.") (quoting *United States v. Kokinda*, 497 U.S. 720, 732, 110 S.Ct. 3115, 3122, 111 L.Ed.2d 571 (1990)); *see also Frisby*, 487 U.S. at 481, 108 S.Ct. at 2500–01. (explaining the residential character of the street "may well inform the application of the relevant test, but it does not lead to a different test").

As explained above, the nature of the forum alone is not decisive of the constitutional question, but rather provides a backdrop for additional First Amendment analysis. We

**5.** When considering regulations that affect public fora the Court often uses the relative terms "heightened" or "stringent" review to indicate the Court's deference for both First Amendment values and the difference between the analysis applied to regulation of the public fora compared to regulation of non-public government property. "Where the government is acting as a proprietor, managing its internal operations, … its action will not be subjected to the *heightened* review to which its actions as a lawmaker may be subject." *International Soc'y for Krishna Consciousness v. Lee*, —— U.S. ——, ——, 112 S.Ct. 2701, 2705, 120 L.Ed.2d 541 (1992) (emphasis supplied). Thus, "highest scrutiny" is reserved for government property that has traditionally been available for public expression. *Id.; see also Frisby v. Schultz*, 487 U.S. 474, 481, 108 S.Ct. 2495, 2500–01, 101 L.Ed.2d 420 (1988) ("stringent standards" have been established for restrictions on speech in traditional public fora); *Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. at 45, 103 S.Ct. at 954–55 (the rights of the

state to limit speech in a public forum are "sharply circumscribed"). Though heightened scrutiny unquestionably applies to public fora regulations, this description must be integrated with the differing levels of heightened review applied depending on whether the regulation is content-based, requiring the most stringent scrutiny, or content-neutral requiring less rigorous review. *See, e.g., Perry*, 460 U.S. at 45, 103 S.Ct. at 954–55.

**6.** When government property is not considered a traditional public forum, nor dedicated to public use, the government has the "power to preserve the property under its control for the use to which it is lawfully dedicated." *E.g., Greer v. Spock*, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976). Were we to accept the City's analysis that streets, while travelled, are not a public forum, our constitutional inquiry would end if the City could show that the Ordinance constituted a reasonable restriction on speech.

therefore move on to examine the Ordinance and its effect on speech.

## III

### Standard of Constitutional Review

■ At the outset the parties have agreed that the Ordinance is content-neutral, and thus, while it falls under the auspices of heightened public fora review, the proper inquiry is whether the Ordinance is a valid time, place or manner regulation. Though the News acknowledged Colorado's elevated deference for First Amendment issues, it did not argue that a different test should apply under the State Constitution.[7] The parties' conclusion properly reflects the fact that after identification of the proper forum, the constitutionality of any proscription on speech will depend on the content and character of the restriction. Not every interference with speech triggers the same degree of scrutiny under the First Amendment. *Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983); *see also Turner Broadcasting Sys., Inc. v. Federal Communication Comm'n,* — U.S. —, —, 114 S.Ct. 2445, 2456, 129 L.Ed.2d 497 (1994) (plurality opinion). The appropriate level of scrutiny is determined by whether the restriction on speech poses an inherent danger to free communication of ideas. *Turner,* — U.S. at —, 114 S.Ct. at 2469. This framework for review based on the content of the proscription was first outlined in *Perry* where the Court delineated two levels of "heightened scrutiny":

> For the State to enforce a content-based exclusion [in a public forum] it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. (citations omitted). The State may also enforce regulations of the time, place, and manner of expression which are content-

neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication. (citations omitted).

*Perry,* 460 U.S. at 45, 103 S.Ct. at 955; *accord Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984) ("Expression whether oral or written or symbolized by conduct, is subject to reasonable time, place or manner restrictions.").

Though the Court often differs over the application of the tests, the basic framework remains intact. Eight Justices concurred on basic First Amendment principles last term in *Turner Broadcasting System, Inc. v. Federal Communication Comm'n,* — U.S. —, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (plurality opinion). Starting with the premise lying at the heart of the First Amendment that "each person should decide for him or herself the ideas and beliefs deserving of expression, consideration and adherence[ ]," the Court went on to explain:

> [f]or these reasons, the First Amendment, subject only to narrow and well-understood exceptions, does not countenance governmental control over the content of messages expressed by private individuals (citations omitted). Our precedents thus apply the most exacting scrutiny to regulations that suppress, disadvantage, or impose burdens upon speech because of the content. (citations omitted). Laws that compel speakers to utter or distribute speech bearing a particular message are subject to the same rigorous scrutiny. (citations omitted). In contrast, regulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny, (citations omitted), because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue. *Turner,* — U.S. at —, 114 S.Ct. at 2458–59.[8]

---

7. Indeed, in its brief on appeal the News agreed with the trial court's application of the test we apply today, stating "[t]he test of constitutionality for a restriction on expressive conduct in a public forum is also well-settled."

8. Though *Turner* addressed the government's ability to regulate cable broadcasts, the Court

stated that the physical characteristics of that system do not "require the alteration of settled principles of our First Amendment jurisprudence." *Id.* at —, 114 S.Ct. at 2457. The Court's current analytical scheme was also highlighted in *Madsen v. Women's Health Ctr.,* — U.S. —, —, 114 S.Ct. 2516, 2534, 129 L.Ed.2d 593 (1994), where the Court distin-

Regulations void of any of the invidious dangers of censorship are therefore subject to less rigorous review than are regulations that prohibit expression based on the message.[9] *See also Ward v. Rock Against Racism,* 491 U.S. 781, 798 n. 6, 109 S.Ct. 2746, 2757–58, n. 6, 105 L.Ed.2d 661 (1989) ("While time, place, or manner regulations must also be 'narrowly tailored' in order to survive First Amendment challenge, we have never applied strict scrutiny in this context."); Martin H. Redish, *The Content Distinction in First Amendment Analysis,* 34 Stanford L.Rev. 113, 117, 123 (1981) (explaining classic content based regulation is not tolerated under the First Amendment, but "when a regulation purports to affect all equally and is designed to avoid harms unrelated to the content of expression ... the Court has engaged in extremely limited scrutiny").

The City contends that the trial court erred by applying a "strict scrutiny" standard of review to the content-neutral Ordinance. While it is true that the trial court stated it would examine the Ordinance under a "strict scrutiny" standard, close examination of the trial court order indicates the most exacting standard of constitutional review was not applied.[10] Rather, the court's analysis included a determination of whether the Ordinance was " 'content-neutral', 'narrowly tailored to serve a significant government interest' and '[ ] leave[s] open ample alternative channels of communication.' " Order at 7. Thus, despite the label applied to its review, the substance of the trial court's order entailed application of heightened review in accord with the standards applicable to content-neutral time, place or manner restrictions. *See, generally, Madsen v. Women's Health Ctr.,* —— U.S. ——, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994).

■ As explained above, a content-neutral restriction will withstand constitutional review if it is narrowly tailored to serve a significant governmental interest. *E.g., id.; Perry,* 460 U.S. at 45, 103 S.Ct. at 954–55 (1983); *Williams v. Denver,* 622 P.2d 542 (Colo.1981). Further, courts must consider the restriction in context to determine whether alternative methods of communication remain available. *Ward,* 491 U.S. at

---

guished time, place and manner review from more complex First Amendment analysis:

> If this were a content-neutral, generally applicable statute, instead of an injunctive order, its constitutionality would be assessed under the standard set forth in *Ward v. Rock Against Racism, supra,* 491 U.S. at 791, 109 S.Ct. at 2753–2754, and similar cases. Given that the forum around the clinic is a traditional public forum, see *Frisby v. Schultz,* 487 U.S. at 480, 108 S.Ct., at 2500, we would determine whether the time, place and manner regulations were "narrowly tailored to serve a significant governmental interest." *Ward, supra* 491 U.S. at 791, 109 S.Ct. at 2753–2754. *See also Perry Education Assn., supra,* 460 U.S., at 45, 103 S.Ct. at 954–955.

9. In *United States v. Grace,* 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983), the Court adhered to the two-tiered approach to public fora analysis, explaining:

> [T]he government may enforce reasonable time, place and manner regulations as long as the restrictions 'are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.' (citations omitted). Additional restrictions such as an absolute prohibition on a particular type of expression will be upheld only if narrowly drawn to accomplish a compelling governmental interest. *See, e.g., Perry Education Assn.,*

*supra,* 460 U.S. at 46, 103 S.Ct., at 955; *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981).

Considered in context "type of expression" relates to the content of the restriction. Any other interpretation ignores the preceding text and the supporting authority for the proposition. *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), here relied on to explain when strict scrutiny applies, dealt with a content-based regulation where the Court explained "[i]n order to justify discriminatory exclusion from a public forum based on the religious content of a group's intended speech, the University must therefore satisfy the standard of review appropriate to content-based exclusions." *Widmar,* 454 U.S. at 269–70, 102 S.Ct. at 274.

10. When considering a content-based restriction or a prior restraint on speech courts apply strict judicial scrutiny which requires a showing that the regulation is "necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *See, e.g., Perry,* 460 U.S. at 45, 103 S.Ct. at 955 (citing *Carey v. Brown,* 447 U.S. 455, 461, 100 S.Ct. 2286, 2290–91, 65 L.Ed.2d 263 (1980)). As the News pointed out in its brief, the incidental use of the term "strict scrutiny" was consistent with a long-line of cases where "to highlight the significance of free speech issues, courts frequently use language of heightened sensitivity." *See, supra* note 5.

802, 109 S.Ct. at 2759–60. We now consider whether the Ordinance constituted a proper time, place and manner restriction under the First Amendment.

## A

### Content-neutral

■ The assessment of content-neutrality depends on whether the regulation is "justified without reference to the content of the regulated speech." *Ward,* 491 U.S. at 791, 109 S.Ct. at 2754. The trial court determined the Ordinance is content-neutral, and on appeal, the parties have agreed that this is so. We agree that the Ordinance is content-neutral because it makes no distinction with respect to the type of solicitation proscribed, nor does it focus upon the sale of any particular publication. The stated purpose of the Ordinance is to eliminate the dangers associated with solicitation in any form, not just the sale of the News. Further, the effect of the ordinance remains constant as to all communicative or noncommunicative material offered for sale.

## B

### Significant Governmental Interest

■ The next step in the analysis is to determine whether the proscription "advance[s] a significant governmental interest." *Perry,* 460 U.S. at 45, 103 S.Ct. at 955; *see also Frisby,* 487 U.S. at 481, 108 S.Ct. at 2500–01 (quoting *Perry*); *United States v. Grace,* 461 U.S. 171, 177, 103 S.Ct. 1702, 1706–07, 75 L.Ed.2d 736 (1983) (quoting *Per-*

*ry*); *see also Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2753–54 (1989) (same) (citing *Clark v. Community for Creative Non-Violence,* 468 U.S. at 293, 104 S.Ct. at 3068–69, *Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3068–69, 82 L.Ed.2d 221 (1984) (same).[11] The City contends that the regulation serves significant interests in traffic control and safety.[12] We recognize that the City has a significant interest in regulating traffic flow on its streets. *Cf. Colorado v. Moldovan,* 842 P.2d 220, 226 (Colo.1992) (explaining the State Department of Highways has an affirmative duty to maintain right-of-way fences to protect highway motorists from the danger of injury caused by collision with livestock); *see also Williams v. Denver,* 622 P.2d 542, 547 (Colo.1981) (City ·of Denver's concern for safety for vehicular traffic and intrusive nature of signs indicates that restrictions on posted signs furthers an important governmental interest). Further, the General Assembly has expressly authorized regulation of city streets by governing municipal bodies to promote traffic safety. § 31–15–702(1)(a)(VI) & (VII), 12B C.R.S. (1986). The nature of city streets and the safety concerns inherent in pedestrian-automobile contact support the conclusion that the governmental interest at stake is indeed significant.

## C

### Narrowly Tailored

The trial court concluded that the ordinance was not narrowly tailored because the City "has methods of promoting its legiti-

---

**11.** Though the significant governmental interest test is well settled, the Court often uses the words "substantial" or "important" in its analysis of the government's interest. For example, the *Ward* Court stated the significant governmental interest test applied, but held that the "[t]he city's sound-amplification guideline is narrowly tailored to serve the substantial and content-neutral governmental interests...." *Ward,* 491 U.S. at 803, 109 S.Ct. at 2760; *see also Frisby,* 487 U.S. at 488, 108 S.Ct. at 2504 (1988) (stating the significant governmental interest test applied and concluding that "the State has a substantial and justifiable interest in banning it [targeted residential picketing])"; *Clark,* 468 U.S. at 299, 104 S.Ct. at 3072 (stating the significant governmental interest test applied and concluding "there is a substantial Government interest in

conserving park property...."). The definition of these words provides insight into their often interchangeable use. Webster's Third New International Dictionary defines significant as deserving to be considered; important, weighty, notable. *Webster's Third New International Dictionary* 2116 (1986). Substantial is defined as something being of substance, important or essential. *Id.* at 2280. Important is defined as marked by or possessing weight or consequence; significant. *Id.* at 1135. The parties agree that the City's interest in traffic safety is significant.

**12.** The concerns include injury to persons and property, prevention of delay and interference with traffic flow. *Aurora Municipal Code* § 37–124(a) (1993).

mate interest in an equally effective way without its virtual total ban on hawkers." The City argues that the trial court erred by applying a "least restrictive means" analysis to the Ordinance, and contends the proper test is whether the governmental interest would be achieved less effectively absent the regulation.

■ Even a content-neutral restriction must be narrowly tailored. *E.g., Madsen v. Women's Health Ctr.,* —— U.S. ——, ——, 114 S.Ct. 2516, 2524, 129 L.Ed.2d 593 (1994). Narrow tailoring does not, however, mean that the regulation must be the least restrictive alternative. The Supreme Court explained this distinction in *Ward v. Rock Against Racism,* 491 U.S. 781, 798, 109 S.Ct. 2746, 2757–58, 105 L.Ed.2d 661 (1989):

> Lest any confusion on the point remain, we reaffirm today that a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but that it need not be the least restrictive or least intrusive means of doing so.

In *Ward,* the Court found that the appellate court had erred by "sifting through all of the available or imagined alternatives" to achieve the city's interest in regulating the sound volume emanating from a municipal bandshell. *Id.* at 797, 109 S.Ct. at 2757. The Court explained the least restrictive analysis has never been part of a time, place and manner analysis. *Id.* at 798 n. 6, 109 S.Ct. at 2757–58 n. 6 ("[T]he same degree of tailoring is not required of these [content-neutral] regulations, and least-restrictive-alternative analysis is wholly out of place."). Rather, the legislation must "promote a substantial government interest that would be

achieved less effectively absent the regulation." *Id.* at 799, 109 S.Ct. at 2758 (quoting *United States v. Albertini,* 472 U.S. at 689, 105 S.Ct. at 2906–07 (1985)).

■ Here, the Ordinance focuses on the interaction between pedestrians and motor vehicles inherent in the act of solicitation of motorists. Solicitation is a form of expression which carries with it conduct incidental to any sales transaction. *See United States v. Kokinda,* 497 U.S. 720, 733–34, 110 S.Ct. 3115, 3123–24, 111 L.Ed.2d 571 (1990) ("Solicitation impedes normal traffic flow ... [because it] requires action by those who would respond."); *cf. City of Ladue v. Gilleo,* —— U.S. ——, ——, 114 S.Ct. 2038, 2041, 129 L.Ed.2d 36 (1994) (explaining that signs, like noise, are a form of expression that pose distinctive problems giving rise to governmental interest in regulation).

At trial, the City presented experts who testified that the sales transactions prohibited by the Ordinance pose substantial dangers to the motoring public and to the hawkers.[13] The City's experts testified that solicitation not only affects the parties directly involved in the transaction, it also increases traffic hazards at more remote locations. For example, an increased risk of rear-end collisions occurs when cars are delayed in turn lanes, disrupting turn signal cycles and causing turn lane traffic to back-up into through lanes. Even the News' expert agreed that hawking activity adds another element to traffic that distracts drivers, but disputed whether this disruption measurably affected traffic safety.[14] When considered in their constitutional context these facts demonstrate that the City has sustained its burden of showing that the Ordinance "is not substantially broader than necessary" to promote the City's significant interest in traffic

---

**13.** The City's expert witnesses testified that direct solicitation from motor vehicles traveling City streets increased traffic hazards and interfered with traffic flow. The City also called four police officers who testified that hawking disrupted traffic patterns and increased the risk of accidents.

**14.** The News introduced into evidence expert testimony that the hawkers' conduct did not measurably affect traffic patterns or safety. The News also introduced evidence regarding the purpose, functioning and success of the hawker program. Finally, the News called two hawkers

who testified regarding their conduct and training, including their receipt of instructions not to obstruct traffic. The hawkers also testified regarding the benefits they personally received from the hawker program. While the benefits to the homeless community are laudable, they do not directly affect our First Amendment analysis. Just as we must turn a blind eye to the message in First Amendment analysis of protected speech, we must also remove from our consideration the status of these individual distributors.

safety, and thus, is sufficiently narrowly tailored. *See Ward,* 491 U.S. at 800, 109 S.Ct. at 2758–59.[15]

We find untenable the suggestion by the News that the Ordinance be reformulated to consider the age of the vendors, the time of day of the sale, or prevailing weather conditions. Every conceivable restriction would not eliminate the sales transaction—money would still change hands, hawkers would still be required to make correct change, and, moreover, every sale would divert the driver's attention from the roadway. Nor would additional tailoring eliminate the cumulative disruption and danger if both Denver newspapers, local newspapers and various street vendors all decided to solicit from the same corner. *See ACORN v. City of Phoenix,* 798 F.2d 1260, 1271 (9th Cir.1986) (explaining a court "may appropriately consider the cumulative impact if many other organizations likewise decided to engage in this activity on a pervasive or regular basis.") (citing *Heffron v. International Soc'y for Krishna Consciousness,* 452 U.S. at 652–54, 101 S.Ct. at 2566–67 (1981)).

More practically, evidence suggested that the restrictive tailoring recommended by the News would not eliminate the problems the Ordinance attempts to address.[16] At the hearing, News' employees testified that the hawker program already incorporates many of the proposed modifications to the Ordinance; hawkers are typically over eighteen years old, they work only during daylight hours, and are instructed to stay out of roadways. Despite these instructions, the trial court found:

> Although the hawkers are instructed about safety and proper sales techniques, the hawkers do no[t] consistently adhere to those procedures. Some hawkers dance and sing. Others conduct sales in lanes of moving traffic. The Aurora videotapes show at least some instances in which hawkers are in lanes of traffic when automobiles are in motion.
>
> . . . .
>
> If a hawker dances or crosses more than two lanes of traffic, (s)he is instructed to cease this conduct. Repeated violations allegedly lead to termination. The Court has no reason to disbelieve this testimony. However, the alleged discipline appears to have little impact on the hawkers' conduct.
>
> . . . .
>
> Generally, hawkers sell newspapers within two to eight seconds. The videotapes confirm trial testimony in this regard. However, the Court finds testimony that hawk-

**15.** Close examination of the trial court's conclusions further supports our ruling. The court observed that "[t]he bulk of the hawkers' activities, as depicted in that [evidence] videotape, had no impact on traffic flow." The court went on to explain the "mere displaying of newspapers did not seem to have any impact on traffic." In drawing its conclusion the court failed to focus on the exact proscription contained in the Ordinance. The bulk of the hawkers' activities such as displaying the newspaper, or even singing and dancing, are not regulated activities. As explained above, the Ordinance is directed solely at the act of solicitation.

**16.** The trial court suggested that a regulation that prohibits hawkers from standing in lanes of moving traffic, or from conducting a sale when traffic is free to move forward would satisfy the City's concerns. In *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984), the United States Supreme Court rejected a similar attempt by the court of appeals to reformulate a Park Service ban on camping, explaining:

> We are unmoved by the Court of Appeals' view that the challenged regulation is unnecessary, and hence invalid, because there are less speech-restrictive alternatives that could have satisfied the Government interest in preserving park lands.... [T]hese suggestions represent no more than a disagreement with the Park Service over how much protection the core parks require or how an acceptable level of preservation is to be attained. We do not believe, however that either *United States v. O'Brien* or the time, place, or manner decisions assign to the judiciary the authority to replace the Park Service as the manager of the Nation's parks or endow the judiciary with the competence to judge how much protection of park lands is wise and how that level of conservation is to be attained.

*Clark,* 468 U.S. at 288, 104 S.Ct. at 3065. *See also Ward,* 491 U.S. at 800, 109 S.Ct. at 2758–59 (finding error in the appellate court's failure to defer to the city's reasonable determination of the best manner to protect its interests); *Cf. Albertini,* 472 U.S. at 689, 105 S.Ct. at 2906 (explaining the validity of a time, place or manner restriction "does not turn on a judge's agreement with the responsible decision maker concerning the most appropriate method for promoting significant governmental interests").

ers can gauge the length of red lights to be unpersuasive. The Aurora videotapes show hawkers facing away from traffic signals. Few of the hawkers appear to be even remotely concerned about traffic light patterns. In fact, hawkers are instructed to face traffic.

. . . .

The Court finds that at least some of the hawkers' activities can and do implicate traffic safety. The purported training has not alleviated these problems.

■ Though no accident occurred during the videotaping, the City need not wait for misfortune to strike to demonstrate the Ordinance addresses legitimate governmental interests. The record and the trial court's corresponding findings contain ample evidence that the conduct of vehicle-addressed solicitation requiring a salesperson to step into City streets or across lanes of traffic impacts both traffic safety and flow. Thus, while further limitations are conceivable, we cannot agree that the Ordinance requires further tailoring to withstand constitutional scrutiny.

The News further argued its activities are no more disruptive than other allowed First Amendment activities, such as the distribution of free newspapers. We do not agree that a proscription becomes unconstitutional merely because it does not burden all communication potentially disruptive to traffic. Indeed, the test for constitutionality mandates that the regulation burden no more communication than is necessary to advance the government's legitimate interests. To suggest that distribution of free newspapers or political advertisement should be curtailed because solicitation is restricted turns the analysis on its head. *See Ater v. Armstrong,* 961 F.2d 1224, 1229 (6th Cir.) (explaining Kentucky's legitimate interest in safety would support the prohibition of all pedestrian activities on its roadways, even the solicitation of funds, which it has chosen to except from the prohibition), *cert. denied,* —— U.S. ——, 113 S.Ct. 493, 121 L.Ed.2d 431 (1992).

D

### Alternative Channels of Communication

■ Finally, we consider whether the ordinance burdens substantially more speech than necessary because it fails to leave open ample alternative methods of disseminating the same information. The trial court found that the News is a newspaper of general circulation "sold to readers by subscription (including home delivery) [and] through free standing newsracks." At oral argument the City pointed out that the News is sold at local grocery and convenience stores, malls and service stations. It is without dispute that the News solicits sales through television, radio and print advertisement and engages in direct telephone solicitation. Despite these facts and its findings, the trial court concluded that alternative channels of communication were inadequate because "[t]he ordinance basically makes the city inaccessible to hawkers." [17] The News urges us to adopt this narrow view of alternatives by focusing on the specific method of distribution to an identifiable market. Neither case law nor commentary supports such a myopic view of alternative channels of communication.

Historically, alternative channels of communication have related to the availability of different media of expression for substantially the same costs. *See City of Ladue v. Gilleo,* —— U.S. ——, ——, 114 S.Ct. 2038, 2045–47, 129 L.Ed.2d 36 (1994) (explaining prior decisions have voiced "particular concern with laws that foreclose an entire medium of expression[ ]"). Typically, courts have considered the medium of expression broadly, as evidenced by the Supreme Court's analysis of a newsrack ban in *City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988). Though the Court ultimately struck the ban because it conferred unbridled discretion on a government official to grant or deny a newsrack permit, the Court neverthe-

---

**17.** Initially, we recognize that the hawkers were not parties to this action, and therefore, we must focus on the injunction as it relates to the News' free speech rights. We also take care to focus on the exact proscription in the Ordinance that limits its access to City streets for vehicle addressed solicitation only.

less explained, "[t]he actual activity at issue here is the circulation of newspapers," rejecting the dissenting point of view that the protected activity was the manner by which the newspapers were circulated. *City of Lakewood,* 486 U.S. at 768, 108 S.Ct. at 2150. *See also* Michael A. Pavlick, Note, *No News(rack) is Good News? The Constitutionality of a Newsrack Ban,* 40 Case Western L.Rev. 451, 456–59 (1989–90) (explaining the Court generally defines channels of communication to encompass all similar methods of disseminating ideas). In *Frisby v. Schultz,* 487 U.S. 474, 483, 108 S.Ct. 2495, 2501–02, 101 L.Ed.2d 420 (1988), the Court upheld a complete ban on targeted residential picketing, explaining the message could be distributed door-to-door, by mail or through direct telephone contact. *Cf. Members of City Council v. Taxpayers for Vincent,* 466 U.S. 789, 812, 104 S.Ct. 2118, 2132–33, 80 L.Ed.2d 772 (1984) (explaining a ban on posting political signs on utility poles leaves open ample alternative modes of communication within the City of Los Angeles). Here, the protected activity is the distribution of newspapers, not the specific distribution by hawkers on city streets who sell to passing motor vehicles. As pointed out above, ample alternatives currently exist, and the Ordinance does not endanger the News' ability to express its ideas.

■ We are not persuaded by the News' argument that its increased circulation must factor into our analysis. As the trial court correctly pointed out, "economic impact is not a proper consideration in free speech cases." (citing *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 46, 106 S.Ct. 925, 928, 89 L.Ed.2d 29 (1986)). In *City of Renton,* the Court upheld a total ban on adult theaters located within 1,000 feet of designated areas, concluding that leaving open approximately five percent of the city land area provided ample alternate locales for the pro-

tected activity. *Id.* at 53, 106 S.Ct. at 931–32. Taking the News' argument to its logical conclusion would require us to strike any restriction that infringed, even insignificantly, on the News' right to enter a new market. However, the basic freedom to expound ideas cannot be equated with the degree of commercial success enjoyed by a particular newspaper. Considering the abundant channels of communication available to the News as a whole, we conclude that this prong of the analysis does not require us to strike the Ordinance.

We find support for our analysis and decision to uphold the Ordinance in several cases where similar proscriptions against solicitation have been sustained. In *ACORN v. City of Phoenix,* 798 F.2d 1260 (9th Cir.1986), the court upheld the constitutionality of a municipal ordinance prohibiting solicitation of funds from vehicle occupants concluding "restrictions on solicitation are particularly appropriate in the context of assuring the free movement of vehicle traffic on city streets." *ACORN,* 798 F.2d at 1268; *see also Association of Community Org. for Reform Now v. St. Louis County,* 930 F.2d 591 (8th Cir.1991) (holding an ordinance proscribing solicitation easily survives the test of whether the County reasonably determined that its interests overall would be served less effectively without the regulation) (citing *Ward,* 491 U.S. at 800–01, 109 S.Ct. at 2759); *United States Labor Party v. Oremus,* 619 F.2d 683, 688 (7th Cir.1980) (recognizing the "evident dangers of physical injury and traffic disruption that are present when individuals stand in the center of busy streets trying to engage drivers and solicit contributions from them").[18]

IV

Issues on Cross-appeal

■ We now turn to the issues raised by the News on cross-appeal, including whether

---

18. The ordinances at issue in the *Phoenix* and *Saint Louis County* cases closely tracked the Ordinance in the case at hand, providing that "[n]o person shall stand on a street or highway and solicit, or attempt to solicit, employment, business or contributions from the occupants of any vehicle." *Phoenix,* 798 F.2d at 1262; *see also St. Louis County,* 726 F.Supp. at 749. The courts there considered solicitation for a non-profit po-

litical action group. Because such conduct clearly receives First Amendment protection the same interests were at stake. In *Houston Chronicle Publishing Co. v. City of Houston,* 620 S.W.2d 833 (Tex.Civ.App.1981), relied on by the trial court, the ordinance in question prohibited more conduct than the City Ordinance, and failed on an equal protection basis as well as under the First Amendment.

the trial court erred in requiring the News to prove that the Ordinance was unconstitutional beyond a reasonable doubt and whether the trial court erred in according the Ordinance a presumption of constitutionality even though it curtailed freedom of speech. While we uphold the trial court's ruling to view the Ordinance as presumptively constitutional, we agree with the News that the government bears the burden of showing that an Ordinance attacked on constitutional grounds withstands constitutional review.

## A

### Presumption of Constitutionality

The News claims that the trial court erred in presuming the Ordinance constitutional, arguing that no presumption of constitutionality should attach to an Ordinance that assails a right as fundamental as freedom of speech. In support of its argument, the News points out that a presumption of constitutionality would contradict the City's burden of showing the Ordinance is constitutional. The News' contention is based upon its misapprehension that presuming the Ordinance constitutional necessarily shifts the burden of proof to the News. This apparent conflict can be resolved by examining the presumption of constitutionality separate from the burden of proof.

At least three options exist when we consider the constitutionality of any legislation. A presumption of constitutionality can be attached, as urged by the City, or, as the News suggests, the legislation can be presumed unconstitutional. Finally, we can determine no presumption exists and examine the legislation absent any underlying presumption. Typically, statutes are presumed constitutional and the party attacking the statute has the burden of proving it unconstitutional beyond a reasonable doubt. *See, e.g., People v. Buckallew,* 848 P.2d 904, 907

(Colo.1993). We have however recognized that the presumption of constitutionality must be modified under certain circumstances. *See People ex rel. Tooley v. Seven Thirty–Five East Colfax, Inc.,* 697 P.2d 348 (Colo.1985) (prior restraint on speech bears a heavy presumption against its constitutionality).

■ Here we do not deal with a prior restraint on speech or censorship.[19] Rather, we consider a content-neutral ordinance with an incidental burden on speech. The Supreme Court has been notably silent with respect to the presumption of constitutionality when analyzing content-neutral legislation, and we have not previously considered this issue. We have, however, implied that a presumption of constitutionality attaches to content-neutral legislation. *See Beathune v. Colorado Dealer Licensing Bd.,* 198 Colo. 483, 485, 601 P.2d 1386, 1387–88 (Colo.1979) (explaining "the presumption of constitutionality of a statute is extremely high where the challenge is to the facial validity of the statute, and there is no potential inhibition of other fundamental freedoms such as freedom of speech"). Attaching a presumption of constitutionality would comport with basic principles of statutory construction, including the presumption that governmental bodies adopt legislation intending compliance with constitutional requirements. *See* § 2–4–201(a) 1B C.R.S. (1980). Applying a presumption of unconstitutionality, on the other hand, would require us to assume legislation violates the constitution even if it advances a significant governmental interest with only an incidental burden on speech. Because a presumption of constitutionality can be attached to the statute without impermissibly shifting the burden of proof, we hold that the trial court did not err in presuming the Ordinance constitutional.

**19.** At the opposite end of the speech continuum lies unprotected speech, such as obscenity. *See Roth v. United States,* 354 U.S. 476, 485, 77 S.Ct. 1304, 1309, 1 L.Ed.2d 1498 (1957). When considering the constitutionality of an obscenity statute we have explained that the "United States Supreme Court has never held that the first amendment requires that a statute proscribing obscenity be presumed unconstitutional where

no prior restraint is involved." *People v. Ford,* 773 P.2d 1059, 1062 (Colo.1989). In *Ford,* we further held that the party attacking such a statute bears the burden of proving its unconstitutionality. We do not today retreat from our view that a prohibition on unprotected speech can be viewed as presumptively constitutional, with the burden placed upon the challenger to prove unconstitutionality beyond a reasonable doubt.

■ In so holding we recognize that a presumption is a rule of convenience based on experience or public policy. *E.g., American Ins. Co. v. Naylor,* 101 Colo. 34, 70 P.2d 349 (1937); *see also Black's Law Dictionary* 1185 (6th ed. 1989) (a presumption is an inference in favor of a particular fact). Thus, when considering any presumption we must also address the weight it is to be afforded. *See Tafoya v. Sears Roebuck & Co.,* 884 F.2d 1330, 1336 (10th Cir.1989) ("status and strength of a rebuttable presumption var[ies] according to the force of the policies which motivate a court or a legislature to create it and ... there are no universal rules as to the amount of evidence necessary to overcome a rebuttable presumption"), *overruled on other grounds, Wagner v. Case Corp.,* 33 F.3d 1253 (10th Cir.1994). Guidance in this regard is found in CRE 301 which states, with respect to civil actions, "a presumption imposes upon the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of non-persuasion, which remains throughout the trial upon the party on whom it was originally cast." We recently came to a similar conclusion in the criminal law context when we considered the presumptions contained in the juvenile bond provisions for gun law violations in *People v. Juvenile Court,* 893 P.2d 81 (Colo.1995). There, we held that the presumption did not shift the burden of proof away from the state, but rather required introduction of some evidence to overcome its effect. *Juvenile Court,* at 93. Here, we conclude that the presumption attached to a content-neutral ordinance attacked on free speech grounds requires the introduction of competent evidence that the regulation burdens speech. Such evidence need not be substantial, but merely sufficient, for the court to determine that a free speech right is indeed infringed. We are satisfied here that the News introduced sufficient evidence that the Ordinance affected free speech.

## B

### Burden of Proof

■ As we stated above, the existence of a presumption is not dispositive of the burden of proof. In recent years the Supreme Court has explained that the burden of proving a content-neutral statute is constitutional rests with the government. *See City of Cincinnati v. Discovery Network, Inc.,* —— U.S. ——, —— n. 12, 113 S.Ct. 1505, 1510 n. 12, 123 L.Ed.2d 99 (1993) ("[T]he state bears the burden of justifying its restrictions, [and] it must affirmatively establish the reasonable fit we require.") (quoting *Board of Trustees of State Univ. of New York v. Fox,* 492 U.S. 469, 480, 109 S.Ct. 3028, 3034–35, 106 L.Ed.2d 388 (1989)); *see also Rickstrew v. People,* 822 P.2d 505, 507 n. 3 (Colo.1991); *cf. Tattered Cover, Inc. v. Tooley,* 696 P.2d 780, 786 (Colo.1985). Thus, after the News introduced evidence that the Ordinance affected speech, the burden shifted to the City to show that the Ordinance withstood application of the appropriate constitutional test.[20] Resolution of the issues on cross appeal in this manner provides a workable framework for constitutional analysis under both the United States and Colorado constitutions.

## V

### Summary

In conclusion, we find that the trial court erred in enjoining enforcement of the Ordinance. The Ordinance does not burden more speech than is necessary to advance the government's legitimate concerns, and leaves open ample alternative channels of communication. Accordingly, we hold that the Ordinance advances a significant governmental

---

20. We do not deal here with a traditional burden of proof that can be quantified by either the proof beyond a reasonable doubt or the preponderance of the evidence standard. While the United States Supreme Court has not provided express guidance as to the quantum of evidence required for a statute to withstand constitutional review, the evidentiary standard is necessarily included within the applicable constitutional test.

That the burden is "high" when considering speech restrictions in public fora analysis, *see Erznoznik v. City of Jacksonville,* 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975), directly reflects the constitutional test that must be applied. Once the government has demonstrated to the court that the legislation complies with constitutional requirements its burden has been met.

interest and is a valid exercise of the City's power to regulate its streets. We therefore reverse and remand the cause to the district court with directions to vacate the Order enjoining enforcement of the Ordinance.

KIRSHBAUM, J., concurs in part and dissents in part, and VOLLACK, J., joins in the concurrence and dissent.

KIRSHBAUM, Justice, concurring in part and dissenting in part:

In parts II and III of its opinion the majority concludes that the trial court erroneously held that City of Aurora Ordinance 93–90 (the Ordinance) violates constitutionally protected free speech rights of the Denver Publishing Company, doing business as the Rocky Mountain News (the News). I believe the trial court reached the correct conclusion, and therefore respectfully dissent from parts II and III of the majority opinion. I concur in parts I and IV of the majority opinion.

In part I of its opinion the majority describes the facts relevant to the determination of the issues raised by this appeal. As the majority observes, to resolve those issues we must determine the appropriate level of scrutiny by which the Ordinance is to be measured and then ascertain whether the Ordinance withstands such scrutiny. Maj. op. at 311. The majority concludes that the Ordinance should be deemed a content-neutral time, place, and manner restriction; that a heightened standard of review is sufficient for both federal and Colorado constitutional purposes; and that the Ordinance withstands such heightened scrutiny.

I agree that given the procedural posture of this case, the Ordinance must be viewed as a time, place, and manner regulation. However, I conclude that, in view of the effect of sections b(2) and b(3) of the Ordinance, strict scrutiny of those sections is necessary for purposes of the First Amendment as well as for purposes of the more protective provisions of article II, section 10, of the Colorado Constitution.[1] I further conclude that sections b(2) and b(3) of the Ordinance in essence constitute a total ban on protected speech in pedestrian-accessible median areas of streets and highways that satisfies neither strict scrutiny nor heightened scrutiny analysis.

### A

The majority holds that the public streets and highways subject to the Ordinance are "traditional public fora." Maj. op. at 311. I agree. The majority then suggests that the City's interest in regulating these traditional public fora is in some manner enhanced because of the nature of the fora. *Id.* This analysis, in my view, undermines the public forum test. It is the nature of the regulated forum, not the nature of the government's interest, that initially determines the applicable level of scrutiny of governmental regulations affecting constitutionally protected speech in such areas. *United States v. Kokinda,* 497 U.S. 720, 732, 110 S.Ct. 3115, 3122–23, 111 L.Ed.2d 571 (1990) (plurality opinion); *Frisby v. Schultz,* 487 U.S. 474, 481, 108 S.Ct. 2495, 2500–01, 101 L.Ed.2d 420 (1985); *Cornelius v. NAACP Legal Defense Educ. Fund, Inc.,* 473 U.S. 788, 800, 105 S.Ct. 3439, 3447–48, 87 L.Ed.2d 567 (1985); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 954–55, 74 L.Ed.2d 794 (1983); *Heffron v. International Soc. for Krishna Consciousness, Inc.,* 452 U.S. 640, 650–51, 101 S.Ct. 2559, 2565–66, 69 L.Ed.2d 298 (1981); *Hague v. Committee for Indus. Org.,* 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939) (plurality opinion). The more public the forum, the more stringent the level of review.

As the majority notes, the parties have stipulated that the Ordinance should be deemed a content-neutral time, place, and

---

1. The majority notes that the News did not argue that a different test should be applied to the Ordinance for purposes of the Colorado Constitution. Maj. op. at 311. However, the majority also notes "Colorado's elevated deference for First Amendment issues." *Id.* Thus, even if the Ordinance is appropriately characterized as a time, place, and manner regulation, the level of judicial scrutiny to be applied to determine if the Ordinance satisfies Colorado's constitutional provisions will often be more stringent than the test required for purposes of First Amendment analysis. *Bock v. Westminster Mall Co.,* 819 P.2d 55, 60 (Colo.1991). The parties cannot, of course, stipulate to the application of an incorrect legal standard.

manner regulation. Maj. op. at 313. Thus the News does not contend that the Ordinance constitutes a prior restraint,[2] even though the operational effect of the Ordinance as to hawkers located in center median areas is virtually indistinguishable from a prior restraint.

However, the fact that a governmental regulation affecting protected speech in a public forum is deemed content-neutral is not the only consideration relevant to the question of which level of scrutiny should be applied to the regulation. The majority has noted the importance of examining the nature of the restriction in determining the appropriate level of scrutiny. Maj. op. at 311. Under current First Amendment jurisprudence, strict scrutiny is required of content-neutral regulations that in practical effect operate as a total or near total ban on protected expression in a public forum.[3]

This principle recognizes that the First Amendment is designed in part to encourage the unfettered communication of ideas in public fora. See Hague, 307 U.S. at 515–16, 59 S.Ct. at 963–64 (plurality opinion). Content-neutral regulations effecting a total or near total ban on all communication in a public forum constitute no less a threat to protected speech than do prior restraints. See United States v. Grace, 461 U.S. 171, 177, 103 S.Ct. 1702, 1706–07, 75 L.Ed.2d 736 (1983) (restrictions that absolutely prohibit expression in public fora "will be upheld only if narrowly drawn to accomplish a compelling governmental interest.");[4] accord Perry, 460 U.S. at 55, 103 S.Ct. at 960 ("In a public forum, by definition, all parties have a constitutional right of access and the State must demonstrate compelling reasons for restricting access to a single class of speakers, a single viewpoint, or a single subject.").[5] The

2. Regulations that have been found invalid as prior restraints have "had this in common: they gave public officials the power to deny use of a forum in advance of actual expression." *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553, 95 S.Ct. 1239, 1243–44, 43 L.Ed.2d 448 (1975). As the Court noted in *Ward v. Rock Against Racism*, 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989), the relevant question in determining whether a challenged ordinance constitutes a prior restraint is whether it "*authorizes* suppression of speech in advance of its expression." *Id.* at 795 n. 5, 109 S.Ct. at 2756 n. 5 (emphasis in original). The total ban on circulation of newspapers from the median area of a public forum imposed by the Ordinance accomplishes that result in this case.

3. Because the forum-based approach acknowledges that streets and parks are public fora in which the state must be especially solicitous of free expression, it would appear to follow that content-neutral restrictions governing streets and parks should be tested by more stringent standards of justification than content-neutral restrictions that do not restrict access to public fora. *See United States v. Grace*, 461 U.S. 171, 177, 103 S.Ct. 1702, 1706–07, 75 L.Ed.2d 736 (1983); *cf. Ward*, 491 U.S. at 799 n. 7, 109 S.Ct. at 2758; *Frisby*, 487 U.S. at 485, 108 S.Ct. at 2502–03 (complete ban can be narrowly tailored but "only if each activity within the proscription's scope is an appropriately targeted evil.").

4. The majority states that this statement from *Grace*, 461 U.S. at 171, 103 S.Ct. at 1703–04, refers only to content-based restrictions. Maj. op. at 312 n. 9. To the contrary, the Court in *Grace* noted that "it is clear that the prohibition is facially content-neutral...." *Grace*, 461 U.S.

at 181 n. 10, 103 S.Ct. at 1709 n. 10. The Court was nonetheless convinced "that the [statute in question], which totally bans the specified communicative activity on the public sidewalks around the Court grounds, cannot be justified as a reasonable place restriction...." *Id.* at 181, 103 S.Ct. at 1709 (footnote omitted). In *McIntyre v. Ohio*, 63 LW 4279 (1995), the United States Supreme Court held that an Ohio statute prohibiting the distribution of anonymous campaign literature violates First Amendment protections. *Id.* at 4286. In so doing, the Court made clear that the Ohio Supreme Court's "reasonable[ness]" and "nondiscriminatory" standard is significantly more lenient than was appropriate because the Ohio statute "involves a limitation on political expression subject to exacting scrutiny." *Id.* at 4282 (citing *Meyer v. Grant*, 486 U.S. 414, 420, 108 S.Ct. 1886, 1891, 100 L.Ed.2d 425 (1988)). In a concurring opinion, Justice Ginsburg noted that the speech at issue in *McIntyre* "bears a marked resemblance to" the speech at issue in *City of Ladue v. Gilleo*, —— U.S. ——, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994), and *Grace*, 461 U.S. 171, 103 S.Ct. at 1703–04, and observed that "[a]ll three decisions ... are sound, and hardly sensational, applications of our First Amendment jurisprudence." *McIntyre*, 63 LW at 4286 (Ginsburg, J., concurring).

5. The principle that content-neutral regulations of protected expression that in effect ban all or almost all such expression are constitutionally suspect may apply even to non-public fora. In both *Young v. American Mini Theatres*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (plurality opinion), and *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), the fact that the regulations

First Amendment therefore prohibits both content-based restrictions that censor particular points of view and content-neutral restrictions that in effect unduly restrict the exercise of free expression. *See* Geoffrey R. Stone, *Content–Neutral Restrictions,* 54 U.Chi.L.Rev. 46, 57–8 (1987). As the Court recently noted in *City of Ladue v. Gilleo,* —— U.S. ——, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994), government regulations that foreclose an entire medium of expression are of particular concern even if such regulations do not constitute content or viewpoint discrimination. *Id.* at ——, 114 S.Ct. at 2045–47 (ordinance that bans a great many, though not all, signs from private residential property held invalid). *See, e.g., Schaumburg v. Citizens for a Better Env't,* 444 U.S. 620, 636–37, 100 S.Ct. 826, 835–36, 63 L.Ed.2d 73 (1980) (government may bar fraudulent political fundraising but may not in the process prohibit legitimate fundraising); *Martin v. Struthers,* 319 U.S. 141, 145–49, 63 S.Ct. 862, 864–66, 87 L.Ed. 1313 (1943) (ordinance banning door-to-door distribution of literature held invalid); *Jamison v. Texas,* 318 U.S. 413, 416, 63 S.Ct. 669, 671–72, 87 L.Ed. 869 (1943) (ordinance banning handbilling on public streets held invalid); *Lovell v. Griffin,* 303 U.S. 444, 451–52, 58 S.Ct. 666, 668–69, 82 L.Ed. 949 (1938) (ordinance banning distribution of pamphlets within municipality held invalid); *cf. Schad v. Borough of Mount Ephraim,* 452 U.S. 61, 75–6, 101 S.Ct. 2176, 2186, 68 L.Ed.2d 671 (1981) (ordinance banning live entertainment held invalid). Thus, although government may target a particular evil within a broad category of speech for regulation, the fact that "some speech within a broad category causes harm ... does not justify restricting the whole category." *Turner Broadcasting System, Inc. v. F.C.C.,* —— U.S. ——, ——, 114 S.Ct. 2445, 2479, 129 L.Ed.2d 497 (1994) (O'Connor, J., concurring in part and dissenting in part). "Broad prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone...." *Id.* at ——, 114 S.Ct. at 2480 (citing *NAACP v. Button,* 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405 (1963)).

As the majority observes, sales transactions are a form of protected speech. Maj. op. at 315. The constitutional guarantee of freedom of the press embraces the circulation of newspapers as well as their publication. *City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 768, 108 S.Ct. 2138, 2150, 100 L.Ed.2d 771 (1988); *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 64 n. 6, 83 S.Ct. 631, 636 n. 6, 9 L.Ed.2d 584 (1963); *Lovell,* 303 U.S. at 452, 58 S.Ct. at 669; *see Near v. Minnesota,* 283 U.S. 697, 720, 51 S.Ct. 625, 632–33, 75 L.Ed. 1357 (1930). As the Court stated in *Ex Parte Jackson,* 96 U.S. 727, 733, 24 L.Ed. 877 (1877): "Liberty of circulating is as essential to [the freedom of the press] as liberty of publishing; indeed, without the circulation, the publication would be of little value." In this case, the Ordinance completely prohibits the circulation rights of the News in designated public fora.

**B**

Because sections b(2) and b(3) of the Ordinance in effect ban all protected speech from the center median areas of streets and highways, which areas are public fora,[6] strict

---

construed therein did not constitute near total bans on protected speech was crucial to the analysis. In *American Mini Theatres,* the plurality emphasized in three different places that "[t]he situation would be quite different if the ordinance had the effect of suppressing, or greatly restricting access to, lawful speech." *American Mini Theatres,* 427 U.S. at 71 n. 35, 96 S.Ct. at 2453 n. 35; *see also id.* at 62, 96 S.Ct. at 2448; *id.* at 70, 96 S.Ct. at 2452. Justice Powell emphasized in a concurring opinion that "[t]he primary concern of the free speech guarantee is that there be full opportunity for expression in all of its varied forms to convey a desired message. Vital to this concern is the corollary that there be full opportunity for everyone to receive the mes-

sage." *Id.* at 76, 96 S.Ct. at 2455 (Powell, J., concurring); *see also id.* at 77–78, 96 S.Ct. at 2455–56. In *Renton* the Court observed that "the First Amendment requires only that Renton refrain from effectively denying respondents a reasonable opportunity to open and operate an adult theater within the city, and the ordinance before us easily meets this requirement." *Renton,* 475 U.S. at 54, 106 S.Ct. at 932; *see also id.* at 46, 106 S.Ct. at 928.

6. Section b(3) of the Ordinance restricts solicitation activity to legal parking areas where the transaction can be "safely conduct[ed]." This section in effect also prohibits sales activities from center median areas because legal parking

scrutiny analysis is required for purposes of ensuring that that section of the Ordinance does not violate First Amendment protections. Furthermore, as the majority recognizes, *see* maj. op. at 309 n. 4, in *Bock v. Westminster Mall Company*, 819 P.2d 55 (Colo.1991), this court held that the protections afforded free speech rights of Colorado citizens by article II, section 10, of the Colorado Constitution exceed the free speech protections established by the First Amendment to the United States Constitution. *Bock*, 819 P.2d at 59, 60, and cases there cited.[7] We also emphasized in *Bock* that the level of scrutiny required to safeguard the broader free speech protections afforded by article II, section 10, of the Colorado Constitution was necessarily more stringent than that associated with First Amendment analysis. *Bock*, 819 P.2d at 60. Whenever government seeks to ban speech protected by article II, section 10, of the Colorado Constitution in public fora, the regulation must be measured by the strict scrutiny standard—the standard that is "most protective of free expression." *Bock*, 819 P.2d at 60.[8]

To satisfy the rigors of strict scrutiny analysis, the City must establish that the Ordinance achieves the goal of furthering compelling governmental interests by means that least limit the free speech rights of the News. *Cornelius*, 473 U.S. at 800, 105 S.Ct. at 3448 ("Because a principal purpose of traditional public fora is the free exchange of ideas, speakers can be excluded from a public forum only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that

interest."); *see Boos v. Barry*, 485 U.S. 312, 329, 108 S.Ct. 1157, 1168, 99 L.Ed.2d 333 (1988); *Schneider v. State*, 308 U.S. 147, 152–64, 60 S.Ct. 146, 149–52, 84 L.Ed. 155 (1939); *cf. Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*, 502 U.S. 105, 118, 112 S.Ct. 501, 509, 116 L.Ed.2d 476 (1991). The evidence at trial, as reflected in the trial court's findings, compels the conclusion that the total ban on sales from center median areas of streets and highways achieved by sections b(2) and b(3) of the Ordinance—the walling off of those public fora from efforts by the News to engage in constitutionally protected speech—does not satisfy this necessarily rigorous test. The center median areas of the streets and highways located in Aurora are by design accessible to pedestrians. The City has not demonstrated a compelling interest in denying hawkers or other pedestrians access to that public forum. Hawkers standing in such areas do not pose a significant safety threat to stationary vehicles. To the extent the City has a legitimate concern for the safety of hawkers and others, regulations restricting the manner in which sales of newspapers to stationary vehicles may be conducted would satisfy such goal without banning all sales.[9] Assuming, *arguendo*, that sections b(2) and b(3) of the Ordinance do further a compelling state interest, they do not do so by the least restrictive means available. As applied to the News, sections b(2) and b(3) of the Ordinance therefore violate the provisions of article II, section 10, of the Colorado Constitution, as well as the First Amendment.

---

areas consist of areas immediately adjacent to the outer boundaries of traffic lanes, which areas are inaccessible from the center median area unless the person performing the activity crosses the traveled portion of a street or highway to enter the parking area.

7. The majority states that the News does "not argue that a different test should apply under the State Constitution." Maj. op. at 311. However, the City argued in its opening brief that "the fact that the Colorado Constitution affords greater protection to freedom of expression than does the United States Constitution does not require a heightened level of scrutiny." Furthermore, in its consolidated response and opening brief, the News specifically relied upon our decision in

*Bock*, 819 P.2d 55, and its recognition that the Colorado Constitution affords broader protection than does the First Amendment.

8. The trial court, citing *Bock*, stated that it would apply strict scrutiny analysis to the Ordinance. However, as the majority notes, the trial court in fact applied the less stringent test of whether the Ordinance was narrowly tailored to carry out a substantial government interest and whether sufficient alternative means of communication remained available to the News. Maj. op. at 313.

9. Section b(1) of the Ordinance accomplishes such goal. Aurora, Co., Code § 37–124 b(1) (1993).

## C

As indicated, I disagree with the majority's conclusion that heightened scrutiny analysis of sections b(2) and b(3) of the Ordinance is adequate. I also conclude, contrary to the majority, that sections b(2) and b(3) of the Ordinance do not survive even this lesser level of scrutiny.

The majority states that to survive heightened scrutiny analysis the Ordinance may not prohibit more protected speech than is essential to accomplish the City's stated purposes. Maj. op. at 315. Relying on *Ward v. Rock Against Racism*, 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989), the majority also indicates that this test is satisfied if the City establishes that the regulation promotes substantial governmental interests "that would be achieved less effectively absent the regulation." Maj. op. at 315. In *Ward*, the Supreme Court did state that "the requirement of narrow tailoring is satisfied 'so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Ward*, 491 U.S. at 799, 109 S.Ct. at 2758 (quoting *United States v. Albertini*, 472 U.S. 675, 689, 105 S.Ct. 2897, 2906, 86 L.Ed.2d 536 (1985)). However, the Court also acknowledged the following principles immediately after the above-quoted sentence:

> To be sure, this standard does not mean that a time, place, or manner regulation may burden substantially more speech than is necessary to further the government's legitimate interests. Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals.

*Id.* (footnote omitted) (citing *Frisby*, 487 U.S. at 485, 108 S.Ct. at 2502–03). Furthermore, the Court in *Ward* emphasized that the regulation therein challenged did not attempt to ban all expression at issue—all rock concerts—but rather focused narrowly on the source of the effects sought to be eliminated—improper sound amplification. The Court cautioned that a "ban on handbilling, of course, could suppress a great quantity of speech that does not cause the evils that it seeks to eliminate, whether they be fraud, crime, litter, *traffic congestion,* or noise."

*Id.* at 801 n. 7, 109 S.Ct. at 2759 n. 7 (emphasis added). "A regulation is not 'narrowly tailored'—even under the more lenient tailoring standards applied in *Ward* and [*City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) ]— where, as here, 'a substantial portion of the burden on speech does not serve to advance [the State's content-neutral] goals.'" *Simon & Schuster*, 502 U.S. at 122 n. *, 112 S.Ct. at 511 n. * (quoting *Ward*, 491 U.S. at 799, 109 S.Ct. at 2758); *see also Turner*, — U.S. at ——, 114 S.Ct. at 2479 (O'Connor, J., concurring in part and dissenting in part). In this case sections b(2) and b(3) of the Ordinance ban all protected speech in a traditional public forum—the center median areas of all streets and highways located in Aurora. This complete ban cannot be justified on the ground that the City's interests would be achieved less effectively by a partial ban of protected speech.

The City advances three purposes for its adoption of the Ordinance: to protect persons and property, to prevent delays, and to prevent interference with traffic flows. Sections b(2) and b(3) of the Ordinance do not merely regulate the time, place, or manner of solicitation in median areas separating traffic lanes for travel in opposite directions; they ban all solicitation in those areas. Such total ban certainly accomplishes the City's purposes in a manner not possible under any less restrictive regulation. Conversely, any regulation would achieve the City's purposes more effectively than no regulation. The question to be answered, however, is whether the City's total ban on protected speech in these public fora is unnecessarily restrictive in view of the City's avowed purposes. *Grace*, 461 U.S. at 181, 103 S.Ct. at 1709 (content-neutral regulations effectuating a total ban of picketing and leafletting on United States Supreme Court sidewalks not sufficiently narrow in scope).

The record contains no evidence that the presence of hawkers on center median areas presents extraordinary safety hazards to property or persons, cause delay, or interfere with traffic flows. The evidence at trial focused primarily on various activities engaged in by some hawkers. As the trial court

indicated, any of a number of content-neutral time, place, and manner restrictions could effectively address Aurora's legitimate public safety concerns without banning all protected speech from the median areas.

The majority's reliance on *ACORN v. City of Phoenix*, 798 F.2d 1260 (9th Cir.1986), and *Association of Community Organizations for Reform Now v. St. Louis County*, 930 F.2d 591 (8th Cir.1991), is misplaced. In both of those cases the solicitation of funds was at issue, not the circulation of newspapers. The trial court in this case appropriately relied upon *Houston Chronicle, Etc. v. City of Houston*, 620 S.W.2d 833 (Tex.Civ. App.1981), which dealt with the circulation of newspapers. *Accord News and Sun–Sentinel Co. v. Cox*, 702 F.Supp. 891 (S.D.Fla. 1988). I agree with the trial court's conclusion that the complete ban of this protected speech in center median areas is not necessary to further the public safety interests pursued by the City.

I also respectfully dissent from the majority's conclusion that the Ordinance leaves sufficient alternative avenues of communication open to the News. Maj. op. at 318. The News has no alternative access to the public fora completely withdrawn from the ambit of its constitutionally protected right of circulation. Access to other fora is not the equivalent of access to public streets and highways located in Aurora. *Grace*, 461 U.S. at 180–81, 103 S.Ct. at 1708–09; *Schneider*, 308 U.S. at 163, 60 S.Ct. at 151 ("[T]he streets are natural and proper places for the dissemination of information and opinion; and one is not to have the exercise of his [or her] liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place."). The City's reliance on general circulation and revenue statistics regarding the economic condition of the News is not persuasive.

The majority relies upon *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988), *Frisby v. Schultz*, 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988), and *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984), in support of its conclusion that the alternative avenues of communication test was satisfied in this case by evidence establishing the general circulation condition of the News. Maj. op. at 318. Those decisions do not support the majority's broad conclusion. In *City of Lakewood*, the Court held that a complete ban on newsracks violated First Amendment protections. *City of Lakewood*, 486 U.S. at 772, 108 S.Ct. at 2152. The statement in that opinion quoted by the majority, which statement characterizes the protected activity as circulation, was made in the context of determining whether First Amendment principles were implicated, not whether the First Amendment was abridged. In *Frisby*, the Court did not view the challenged ordinance as constituting a total ban on picketing activities in residential neighborhoods, but rather determined that the ordinance prohibited only the picketing of a single residence. *Frisby*, 487 U.S. at 486, 108 S.Ct. at 2503. The Court emphasized that "[t]he type of focused picketing prohibited by the [challenged] ordinance is fundamentally different from more generally directed means of communication that may not be completely banned in residential areas." *Id.* In *Vincent*, the Court emphasized that the public property subjected to governmental regulation was not a public forum and rejected an invitation to utilize the heightened scrutiny analysis required by the public forum doctrine. *Vincent*, 466 U.S. at 814, 104 S.Ct. at 2134.

Sections b(2) and b(3) of the Ordinance ban all circulation efforts by the News in the center median areas of streets and highways located in Aurora—traditional public fora. As applied to the News, sections b(2) and b(3) of the Ordinance do not simply bar one particular means of circulating ideas; they completely prohibit circulation of ideas in particular places. In these circumstances, the City has not satisfied its burden of establishing the availability of adequate alternative methods of circulation for purposes of heightened scrutiny analysis.

### D

For the foregoing reasons, I respectfully dissent from parts II and III of the majority opinion and would affirm the trial court's conclusion that the Ordinance impermissibly restricts constitutionally protected rights of the News.